AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

### for the

### District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>INFORMATION ASSOCIATED WITH ONE CELL PHONE<br>ACCOUNT CONTROLLED BY AT&T CORP. PURSUANT TO<br>18 U.S.C. § 2703 FOR INVESTIGATION OF VIOLATIONS OF 18<br>U.S.C. §§ 111, 113(a), 231, 1752(a), AND 40 U.S.C. § 5104(e)(2) | )<br>)<br>)<br>)<br>)<br>)<br>)    Case No.  22-SC-1056 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

Located in the _____ Northern District of Texas _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 111(a)(1); 18 U.S.C. § 113(a)(4) and (a)(5); 18 U.S.C. § 231; 18 U.S.C. § 1752(a); 40 U.S.C. § 5104(e)(2). | |

The application is based on these facts:

See Affidavit in Support of Application for Search Warrant.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Garrett S. Churchill, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
Telephone _____ *(specify reliable electronic means).*

Date: _____ 4/21/2022 _____

*Judge's signature*

City and state: _____ Washington, D.C. _____

G. Michael Harvey
United States Magistrate Judge

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means ☐ Original  ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| INFORMATION ASSOCIATED WITH ONE CELL PHONE ACCOUNT CONTROLLED BY AT&T CORP. PURSUANT TO 18 U.S.C. § 2703 FOR INVESTIGATION OF VIOLATIONS OF 18 U.S.C. §§ 111, 113(a), 231, 1752(a), AND 40 U.S.C. § 5104(e)(2) | ) ) ) ) |

Case No.  22-SC-1056

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure  of the following person or property located in the _____ Northern District of Texas _____ .
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A (incorporated by reference).

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated by reference).

**YOU ARE COMMANDED** to execute this warrant on or before _____ May 05, 2022 _____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ G. Michael Harvey _____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued: _____ 4/21/2022 _____

City and state: _____ Washington, D.C. _____

_____ *Judge's signature*

G. Michael Harvey
United States Magistrate Judge

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br><br>22-SC-1056 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## **ATTACHMENT A**

### **Property to Be Searched**

This warrant applies to records and information associated with the cellular telephone number ███ ████ (the "ACCOUNT"), and which is stored at premises owned, maintained, controlled, or operated by AT&T Corporation ("PROVIDER"), a wireless communications service provider headquartered in Dallas, Texas.

**Attachment B**

**Particular Things to be Seized and Procedures to Facilitate Execution of the Warrant**

I.      **Information to be Disclosed by AT&T ("PROVIDER") to Facilitate Execution of the Warrant**

To the extent that the information described in Attachment A is within the possession, custody, or control of the PROVIDER, including any information that has been deleted but is still available to the PROVIDER or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the PROVIDER is required to disclose to the government the following information pertaining to the ACCOUNT listed in Attachment A:

   a.   The following information about the customers or subscribers associated with the ACCOUNT for the time period November 3, 2020 through February 28, 2021:

   i.   Names (including subscriber names, user names, and screen names);

   ii.   Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

   iii.   Local and long distance telephone connection records;

   iv.   Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

   v.   Length of service (including start date) and types of service utilized;

   vi.   Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber

2

Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

    vii.  Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

    viii.  Means and source of payment for such service (including any credit card or bank account number) and billing records.

b.  For the time period from November 3, 2020 through February 28, 2021: All records and other information relating to wire and electronic communications sent or received by the ACCOUNT, including:

    i.  Records of the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses), including web browsing history and text messaging history;

    ii.  information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received; and

    iii.  Records and information regarding per-call measurement data (PCMD) (also known as Network Event Location Services (NELOS), Timing Delay/Timing Advance (TA), TrueCall, Time on Tower Report, and/or Real Time Tool (RTT) data).

c.  For the time period from November 3, 2020 through the present: The contents of all communications and related transactional records for all PROVIDER services used by an ACCOUNT subscriber/user (such as voice call services, voice mail, text messaging,  SMS, instant messaging or chat services, or picture and imaging sharing services), including but not limited to incoming, outgoing, and draft calls, chats, messages, and other electronic communications; attachments to communications (including native files); source and destination addresses and header or routing information for each communication; the date, size, and length of each communication; and any user or device identifiers linked to each communication (including cookies);

d.  For the time period from November 3, 2020 through the present: The contents of all other data and related transactional records for all PROVIDER services used by an ACCOUNT user (such as voice call services, instant messaging or chat services, or remote computing services), including any information generated, modified, or stored by user(s) or PROVIDER in connection with the ACCOUNT (such as voicemail, text and SMS messages, contacts, images, videos, notes, documents, bookmarks, profiles, device backups, and any other saved information);

e.  All records pertaining to devices associated with the ACCOUNT, including the names and phone numbers associated with other devices on the subscriber's plan, including device serial numbers, instrument numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access Control ("MAC")

4

addresses, operating system information, browser information, mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such device(s).

The Provider is hereby ordered to disclose the above information to the government within 14 days of the issuance of this warrant.

## II.   Information to be Seized by the Government

All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violations of 18 U.S.C. §§ 111, 113(a), 231, 1752(a), and 40 U.S.C. § 5104(e)(2), as described in the affidavit submitted in support of this Warrant, during the period of November 3, 2020 through February 28, 2021.

(a) Information that constitutes evidence concerning the riot that occurred at the U.S. Capitol on January 6, 2021; or assaults on law enforcement or members of the news media, on January 6, 2021;

(b) Information that constitutes evidence of any planning and preparation that the user of the account undertook prior to committing the criminal activity under investigation;

(c) Information that constitutes evidence of any steps that the user of the account took to disguise or hide their participation in the criminal activity under investigation;

(d) Information that constitutes evidence of the identification or location of the user(s) of the ACCOUNT;

(e) Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the

5

ACCOUNT about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

(f) Information that constitutes evidence indicating the ACCOUNT user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

Evidence indicating how and when the account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the account owner; and,

The identity of any person(s) who communicated with the ACCOUNT about matters relating to the events of January 6, 2021, including records that help reveal their whereabouts.

III.     **Government procedures for warrant execution**

The United States government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section II.  That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section II and will not further review the information absent an order of the Court. Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

This warrant authorizes a review of records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for

the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH ONE CELL PHONE ACCOUNT CONTROLLED BY AT&T CORP. PURSUANT TO 18 U.S.C. § 2703 FOR INVESTIGATION OF VIOLATIONS OF 18 U.S.C. §§ 111, 113(a), 231, 1752(a), AND 40 U.S.C. § 5104(e)(2)**

Case No. 22-SC-1056

**<u>Filed Under Seal</u>**

*Reference:      USAO Ref. # 2021R002212; Subject Account(s):* ███████

### AFFIDAVIT IN SUPPORT OF <u>AN APPLICATION FOR A SEARCH WARRANT</u>

I, Garrett S. Churchill, being first duly sworn, hereby depose and state as follows:

### <u>INTRODUCTION AND AGENT BACKGROUND</u>

1.      I make this affidavit in support of an application for a search warrant for certain location and related information associated with ONE CELLULAR TELEPHONE ACCOUNT (the "ACCOUNT") assigned the phone number ███████ ("TARGET PHONE NUMBER"), that is stored at premises controlled by AT&T Corporation ("PROVIDER"), a cellular service provider headquartered in Dallas, Texas. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require PROVIDER to disclose to the government copies of the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI), Washington Field Office.  I have been in this position since September 30, 2019 and am currently assigned to investigate Public Corruption and Government Fraud in the District of Columbia.  As a member of the Washington Field Office's Criminal Branch II, I have also been assisting in the investigation of violent crimes committed against law enforcement officers and members of the media in or around the U.S. Capitol Building on January 6, 2021.  My primary responsibilities include conducting investigations involving public corruption, fraud, civil rights crimes and other related violations of federal criminal law. I have received a Juris Doctorate from the University of Georgia and have been a member of good standing of the State Bar of Georgia since 2010. I have experience with federal criminal law, the Federal Rules of Evidence and the Federal Rules of Criminal Procedure.  During my training at the FBI Academy, Quantico, Virginia, I received training in areas such as physical surveillance, legal statutes and procedures, financial investigations, confidential source management, Fourth Amendment searches, the drafting of search warrant affidavits, probable cause and digital forensic data analysis.

3.      I base the facts set forth in this affidavit upon my personal knowledge, information obtained during my participation in this investigation, review of documents to include business and bank records and official government records, knowledge obtained from other individuals including law enforcement personnel, and communications with others who have personal knowledge of the events and circumstances described herein.  Because this affidavit is being submitted for the limited purpose of enabling this Court to make a judicial determination of probable cause to issue a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish the legal basis for the issuance of a search warrant.  The dates listed in this affidavit should be read

as "on or about" dates.  Unless specifically indicated, all conversations and statements described in this affidavit are related in substance and in part only and are not intended to be a verbatim recitation of such statements.  All times provided in this affidavit should be read as "on or about" times and are given in Eastern Standard Time (EST) unless otherwise noted.

4.      Based on the facts set forth in this affidavit, there is probable cause to believe that BENJAMEN BURLEW ("BURLEW") has violated 18 U.S.C. § 111, 18 U.S.C. § 113(a)(4) and (a)(5), 18 U.S.C. § 231, 18 U.S.C. § 1752(a), and 40 U.S.C. § 5104(e)(2).  There is also probable cause to believe that the historical location information, as described in Attachment B, will constitute evidence of these criminal violations.

5.      The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711.  Specifically, the Court is a district court of the United States that has jurisdiction over the offenses being investigated; *see* 18 U.S.C. § 2711(3)(A)(i). As discussed more fully below, the acts in furtherance of the violations of 18 U.S.C. § 111(a)(1), § 231, § 1752(a) and 40 U.S.C. § 5104(e)(2) occurred within Washington, D.C. *See* 18 U.S.C. § 3237. Furthermore, the acts in furtherance of the violation of 18 U.S.C. § 113(a)(4) and (a)(5) occurred on the United States Capitol Building and Grounds, which constitute the "territorial jurisdiction" of the United States as "lands reserved or acquired for the use of the United States" and under its "exclusive or concurrent jurisdiction."  See 18 U.S.C. § 7(3).

**PROBABLE CAUSE**

*Background – The U.S. Capitol on January 6, 2021*

6.      USCP, the FBI, and assisting law enforcement agencies are investigating a riot and related offenses that occurred at the United States Capitol Building, located at 1 First Street, NW, Washington, D.C., 20510 at latitude 38.88997 and longitude -77.00906 on January 6, 2021.

7.      At the U.S. Capitol, the building itself has 540 rooms covering 175,170 square feet of ground, roughly four acres.  The building is 751 feet long (roughly 228 meters) from north to south and 350 feet wide (106 meters) at its widest point.  The U.S. Capitol Visitor Center is 580,000 square feet and is located underground on the east side of the Capitol.  On the west side of the Capitol building is the West Front, which includes the inaugural stage scaffolding, a variety of open concrete spaces, a fountain surrounded by a walkway, two broad staircases, and multiple terraces at each floor.  On the East Front are three staircases, porticos on both the House and Senate side, and two large skylights into the Visitor's Center surrounded by a concrete parkway.  All of this area was barricaded and off limits to the public on January 6, 2021.

8.      The U.S. Capitol is secured 24 hours a day by USCP.  Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by USCP.  Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

9.      On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

10.     On January 6, 2021, a joint session of the United States Congress convened at the U.S. Capitol.   During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the U.S. Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which

took place on November 3, 2020 ("Certification").  The joint session began at approximately 1:00 p.m. Eastern Standard Time (EST).  Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection.  Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

11.     As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol.  As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and USCP were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

12.     At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of the U.S. Capitol Police, as others in the crowd encouraged and assisted those acts.

13.     Shortly thereafter, at approximately 2:20 p.m., members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers. Accordingly, the joint session of the United States Congress was effectively suspended until shortly after 8:00 p.m. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the sessions resumed.

14.     After the U.S. Capitol was breached, United States Capitol Police (USCP) requested assistance from law enforcement agencies in the area to protect the Capitol, keep people

from entering the Capitol, and expel the crowd that was inside the Capitol. Multiple officers with the Metropolitan Police Department and other law enforcement officers came to assist.

15.     During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

16.     Additionally, news coverage of January 6, 2021 documented numerous attacks on members of the news media who were present to cover the events at, around and in the U.S. Capitol building.   These included reports of members of the news media being harassed, threatened, robbed, and assaulted based on their perceived roles as journalists, and equipment belonging to several news organizations was stolen, damaged and/or destroyed.

### *Facts Specific to This Application*

17.     As explained further below, two videos from separate sources taken during the riots on January 6, 2021, at the United States Capitol depict an individual, subsequently identified as BENJAMEN BURLEW ("BURLEW"), engaging in a physical assault against a credentialed member of the news media ("MONM"), an Associated Press photographer (hereafter referred to as "the MONM victim"). This assault included physically grabbing and shoving the MONM victim and pushing him forcefully over a low wall. These crimes occurred in the general area of the Lower West Terrace of the U.S. Capitol Building during the riots on January 6, 2021. The investigation also revealed that BURLEW assaulted a law enforcement officer at the U.S. Capitol, prior to the assault on the MONM victim, as specified below, during the riot on January 6, 2021.

18.     Your affiant reviewed publicly available video footage depicting the assault of the MONM victim ("The Video") that was retrieved from the verified Instagram account of another

Associated Press photographer and the MONM victim's colleague who was present with the MONM victim during the assault, and filmed the incident as it occurred (the "MONM witness"). The MONM witness later posted The Video to his Instagram account and the footage was reposted publicly by various media outlets on their respective websites and incorporated into reporting about the events of January 6, 2021 (e.g., an article by Associated Press journalist David Bauder, titled "Journalists recount harrowing attacks amid Capitol Riot" posted on the Associated Press's website on January 8, 2021, and accessible at the following link:https://apnews.com/article/donald-trump-new-york-journalists-media-social-media-cba6bd7b93be0ade1da714a32c33d74c).

19.     Your affiant reviewed the Video and observed an individual with the following identifying characteristics: white male with short, thinning black hair and a mixed black and gray beard, wearing a blue and white neck bandana, a green/gray camouflage pattern quarter zip jacket and carrying a dark green backpack.  This individual was later identified through investigation, as explained in detail below, as BURLEW. BURLEW could be observed on the Video shoving the MONM victim using BURLEW's right hand placed on the MONM victim's back, over the MONM victim's black backpack.

20.     After disengaging from the assault on the MONM, BURLEW was then subsequently observed on the Video lunging towards the MONM victim as the MONM victim was being shoved backwards towards a low stone wall, which lies several feet above the grass of the west lawn of the U.S. Capitol building.  BURLEW was observed to grab the MONM victim's upper chest with BURLEW's left hand and the MONM victim's right leg and knee with BURLEW's right hand and forcefully throw and push the MONM victim over the wall and to the lawn several feet below.  Faint green tattoo markings on BURLEW's left hand were observed by

your affiant during this altercation. The MONM victim, together with at least one individual that was standing on the low wall behind the MONM victim and inadvertently caught up in the melee, was observed to land on his back on the ground several feet below the wall, on the grounds of the west lawn of the U.S. Capitol, while BURLEW leaned over the wall and observed the MONM victim's fall.

21.     Based on the timing and location of the above-described assault, your affiant reviewed the body-worn camera footage (the "BWC Video") of a District of Columbia Metropolitan Police Department ("MPD") Officer who was standing near the Lower West Terrace of the U.S. Capitol during the approximate time that the assault occurred. The officer was positioned near a line of bike racks, which was being used as a barrier against the assembling crowd by officers of the MPD and U.S. Capitol Police. The bike rack was positioned close to the top lip of the stairs that the MONM victim was observed to be standing on at the beginning of the Video.

22.     Subsequently, your affiant observed BURLEW on the BWC Video at approximately 1:35:36 PM. This observation of BURLEW appears consistent with BURLEW's location while shoving the MONM victim for the first time, as described *supra* paragraph 19.

23.     After review of the aforesaid videos, the FBI utilized investigative resources to develop multiple images of BURLEW, at the time an unknown subject, from the Video and the BWC Video. These images were assigned BOLO #195 (all points bulletin, also known as "be on the look-out") and were placed on the FBI's "Most Wanted" U.S. Capitol Violence webpage, currently accessible at https://www.fbi.gov/wanted/capitol-violence (the "Capitol Violence Webpage"), to allow members of the public to review images of BOLO #195, as well as BOLO

images of other offenders whose conduct had been identified as criminal but whose identities were unknown, and assist the FBI in identifying these offenders.

24.     Multiple tips were submitted to the FBI that identified BOLO #195 as BURLEW, which were followed up and corroborated by investigators, as described in more detail below.

25.     A group of internet sleuths (collectively, "CW-1"), who had previously provided assistance to the FBI in connection with the Capitol riots investigation, submitted a tip consisting of a link to a publicly available video posted on YouTube to the YouTube channel of Citizen Media News (the "YouTube Video"), recorded by an unknown individual (the "Recorder"). CW-1 indicated that the unknown subject known as BOLO #195 could be observed in the YouTube Video and appeared to state his name and the state of his residence to the Recorder.  Review of the YouTube channel to which the YouTube Video was posted appears to be associated with CitizenMedia News (www.citizenmedianews.com), which purports to be a "grassroots" journalism and media platform.

26.     Your affiant has reviewed the YouTube Video and observed an individual matching the description of BURLEW (white male, short, thinning black hair, mixed black and gray beard, blue and white neck bandana,green/gray camouflage pattern quarter zip jacket) provide his name as "Ben Burlew" [spelled phonetically] and his state of residence as "Oklahoma."  Additionally, your affiant observed distinctive green tattoo markings on the back side of the individual's left hand, consistent with the markings observed on BURLEW's hand in the Video (*supra* paragraph 19).

27.     Using the self-identification, your affiant reviewed Oklahoma driver's license information and located an individual named "BENJAMEN SCOTT BURLEW" whose

appearance in his driver's license photo was consistent with the images of BURLEW observed by your affiant in The Video, the BWC Video, and the YouTube Video.

28.     Further, your affiant conducted a review of other submitted tips and ongoing FBI investigations that may have also implicated or mentioned BURLEW.  This search revealed that on January 9, 2021, an individual ("CW-2") submitted an on-line tip to the FBI National Threat Operations Center ("NTOC") and reported that Benjamen Burlew was in Washington, D.C. on January 5, 2021, and January 6, 2021, and possibly entered the U.S. Capitol building.  CW-2 reported that Burlew was a former serviceman in the U.S. Army and provided identifiers for BURLEW, including his current address and his cellphone number, which was the TARGET PHONE NUMBER.  CW-2 indicated that BURLEW's wife would likely be the named party on any bank accounts, property or financial obligations owned by or accruing to BURLEW.

29.     Based on these allegations, on January 13, 2021, CW-2 was re-contacted and interviewed telephonically by an FBI agent, and provided additional information. CW-2 had observed a video phone call between BURLEW and a close family member of BURLEW ("Family Member-1") on or about December 24, 2020. During the call, CW-2 had overhead BURLEW state that he was planning to go to Washington, D.C. on January 4, 2021, in a caravan and "storm the Capitol." CW-2 had also overhead a phone call between BURLEW and Family Member-1 on or about January 6, 2021 in which BURLEW appeared to be in Washington, D.C. and in which BURLEW had stated that "people were acting silly" and that it was time for BURLEW to leave. CW-2 did not know of any photographs of BURLEW inside the Capitol building or if BURLEW had participated in illegal activity while present in Washington, D.C.  CW-2 clarified his/her initial report that he/she had no actual knowledge that BURLEW had been inside of the U.S. Capitol but

that he/she had overhead him say on or about December 24, 2020 that he had planned to "storm the Capitol."

30.     Subsequently, on March 11, 2021, FBI agents and task-force officers ("TFO") attempted to interview BURLEW at the residential address provided by CW-2 (the "BURLEW Residence"). The agents contacted BURLEW using the TARGET PHONE NUMBER. BURLEW answered the call, identified himself, and identified the TARGET PHONE NUMBER as his cellular phone number. BURLEW declined to answer questions about whether he had been in Washington, D.C. on January 6, 2021, or participated in any of the civil unrest that took place during the day. BURLEW further advised the interviewing agents that he was recording their interaction and would not speak further with agents without his lawyer present.

31.     On March 15, 2021, a second telephonic interview of BURLEW was attempted by FBI agents and/or TFOs. BURLEW was called at the TARGET PHONE NUMBER and BURLEW again picked up the call. BURLEW was asked to schedule an interview with the agents and advised that his attorney could accompany BURLEW to the interview. BURLEW stated that he had spoken with his lawyer who advised BURLEW that he should not speak with the FBI. The interviewing agents advised BURLEW of the nature of the interview and BURLEW stated that the FBI was lying about information received that BURLEW was present in Washington, D.C. on January 6, 2021, and stated that he did not wish to speak with the FBI regarding his presence or conduct in Washington, D.C. on or about January 6, 2021.

32.     On or about the week of May 24, 2021, an individual ("CW-3") with a familial relationship to BURLEW called the FBI NTOC to report the identity of FBI BOLO #195 as BURLEW. CW-3 alleged that BURLEW had asked CW-3 to go to Washington, D.C. with BURLEW on January 6, 2021, but that CW-3 had declined BURLEW's invitation. CW-3 stated

that BURLEW had prior military service in the U.S. Army and that BURLEW lived "out in the middle of nowhere" in Oklahoma.

33.    On or about the week of May 31, 2021, an individual ("CW-4") called the FBI NTOC to report the identity of FBI BOLO #195 as BURLEW. On June 2, 2021, your affiant contacted CW-4 telephonically for an interview. CW-4 alleged that BURLEW and CW-4 had been co-workers in the past and that BURLEW's name had been "going around" their place of work as wanted by the FBI.  CW-4 had recognized BURLEW based on his build, facial features, hair and beard, which were consistent with the images of BOLO #195 posted on the Capitol Violence Webpage.  Due to his limited relationship with BURLEW and the fact that gloves were often worn on the job by CW-4 and his coworkers, CW-4 did not recall whether BURLEW had any tattoos or markings on his left hand and arm.

34.    On or about June 24, 2021, CW-2 was re-interviewed by FBI agents and shown the aforesaid images of BOLO #195. CW-2 was able to positively identify these images as BURLEW. CW-2 was asked if BURLEW had any unique identifying marks or features, such as scars or tattoos. CW-2 was able to identify the distinctive green tattoo on BURLEW's left hand that was observed by your affiant, *supra* paragraphs 19 and 21.

35.    Based on the information above, on June 25, 2021, your affiant submitted a 27-page affidavit in support of a criminal complaint concerning BURLEW's violations of 40 U.S.C. § 5104(e)(2)(F) and 18 U.S.C. § 113(a)(4), and an arrest warrant for BURLEW (the "Arrest Warrant") in connection with such violations to the United States District Court for the District of Columbia.

36.    The Hon. G. Michael Harvey, United States Magistrate Judge, United States District Court for the District of Columbia, issued the aforesaid complaint and the Arrest Warrant

on June 25, 2021. See Case Number 1:21-mj-00501. Special Agents from the FBI Oklahoma City

Field Office (FBI-OC) executed an arrest of BURLEW, pursuant to the Arrest Warrant, on or about

August 18, 2021.

37.     Subsequent to the arrest of BURLEW and a press release made by the United States

Attorney's Office related to BURLEW and the charge on which he was arrested, an anonymous

individual ("CW-5") submitted a tip to the FBI's tip-line that though authorities had arrested

BURLEW for the MONM victim assault, BURLEW had also engaged in additional criminal

conduct on January 6, 2021 while wearing a different set of clothing than that displayed in

BURLEW's original FBI BOLO photographs. Specifically, CW-5 alleged that BURLEW had

engaged in an assault against a MPD officer on January 6, 2022, in addition to the known assault

committed against the aforesaid MONM victim.

38.     Review of several publicly available YouTube video links provided by CW-5 led

to the observation that an individual had assaulted a black male DC MPD police officer (the

"Victim Officer") in the vicinity of the stairs of the Lower West Terrace of the U.S. Capitol

Building on January 6, 2021. Specifically, the assailant was a white male with short, thinning black

hair and a mixed black and gray beard, wearing a dark green backpack, a black long-sleeved upper

garment, black and orange gloves, and a black trucker-style ballcap. The assailant could be

observed rushing at the Victim Officer and then engaged in a physical scuffle with him, appearing

to attempt to tackle and/or wrestle the Victim Officer to the ground. Subsequently, the assailant

was sprayed by OC/pepper spray repeatedly by another DC MPD police officer in the vicinity, and

disengaged from the assault and ran away, back into the crowd.

39.     Review of the aforesaid videos resulted in the identification of DC MPD officers

(based on visible name plates) that would have vantage points to have caught the assault of the

Victim Officers on their BWC. Subsequently, your affiant acquired and reviewed BWC footage of these DC MPD officers, which resulted in the positive identification of the Victim Officer. The BWC footage of the Victim Officer was also procured and reviewed.  Generally, the review of this BWC footage further substantiated the assault on Victim Officer by the assailant.  It was further observed that the assailant, while wearing different clothing than that worn by BURLEW during the MONM victim assault, appeared to be wearing a backpack (green backpack with distinctive red pull tabs) identical to that worn by BURLEW during the MONM assault, as well as pants and shoes consistent with those worn by BURLEW during the MONM assault. In addition, the assailant's face, voice, and profile were all visible and audible on the video links submitted by CW-5 and in the BWC footage reviewed by your affiant, and were found to be consistent with BURLEW's face, voice, and profile as they appeared in the review of the aforesaid videos and images from the MONM assault. These similarities led to the identification of the assailant as BURLEW. Time-stamps on the BWC footage established that the assault against the Victim Officer happened prior to the assault against the MONM victim described above.  The additional clothing (trucker hat, gloves, black long-sleeved upper garment) worn by BURLEW during this assault appear to represent heavier, winter-type clothing than what BURLEW wore during the MONM victim assault.

40.     Subsequent to the review of the aforesaid BWC footage, the videos provided by CW-5, and other publicly available videos and media, the Victim Officer was interviewed by FBI agents.  During the interview, the Victim Officer was shown the aforesaid BWC footage and some of the publicly available videos depicting his assault by BURLEW. The Victim Officer stated during the interview that he recalled the specific physical altercation with the individual pictured, The Victim Officer did not know the identity of his assailant, but identified the assailant as

BURLEW when shown multiple images of BURLEW, dressed in the alternative set of clothing described above, that were pulled from the BWC footage and videos referred to above.

***Probable Cause that BURLEW is the User of the TARGET PHONE NUMBER and ACCOUNT***

41.     Subpoena results from AT&T in June 2021 revealed that B.B., the maiden name of BURLEW's wife, was listed as the subscriber for the ACCOUNT associated with the TARGET PHONE NUMBER. The ACCOUNT had a listed billing address of the BURLEW Residence. BURLEW is known to be the primary user of the TARGET PHONE NUMBER and the ACCOUNT. FBI agents used the TARGET PHONE NUMBER to contact BURLEW on two separate occasions to conduct telephonic interviews. On one occasion, BURLEW confirmed to FBI agents that the TARGET PHONE NUMBER was the number at which he could be reached. Subsequently, the Oklahoma Bureau of Narcotics agents also used the TARGET PHONE NUMBER to successfully contact BURLEW on multiple occasions.

42.     Based on the above evidence, there is probable cause to believe that BURLEW is significantly connected to and is the primary user of the TARGET PHONE NUMBER, and the ACCOUNT is held in the name of BURLEW's wife and registered to BURLEW's residence and thus probable cause exists to collect location information for the historical period set forth in Attachment B, for the purpose of providing additional, electronic evidence that BURLEW was physically present in Washington, D.C. on January 6, 2021 and committed the aforesaid crimes.

## BACKGROUND ON CELL-SITE DATA AND LOCATION INFORMATION

43.     In my training and experience, I have learned that PROVIDER is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including: (1) E-911

Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or "cell tower/sector records." E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

44.    Based on my training and experience, I know that PROVIDER can collect E-911 Phase II data about the location of the TARGET PHONE NUMBER including by initiating a signal to determine the location of the TARGET PHONE NUMBER on PROVIDER's network or with such other reference points as may be reasonably available.

45.    Based on my training and experience, I know that PROVIDER can collect cell-site data about the TARGET PHONE NUMBER. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as PROVIDER typically collect

and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

46.     Based on my training and experience, I know that AT&T also collects additional estimated location information commonly referred to as NELOS. NELOS information can provide an approximate location of the cellular device utilizing a combination of timing advance, Wi-Fi and global positioning information (GPS).  At times, this information can supplement cell site data when no call or text information is available.

47.     Based on my training and experience, I know that each cellular device has one or more unique identifiers embedded inside it.  Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers – as transmitted from a cellular device to a cellular antenna or tower – can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.  During the historical time period described in more detail in Attachment B, the TARGET PHONE NUMBER was assigned to the following cellular device: Apple iPhone 11 Pro Max, IMEI # ███████████ .

48.     Based on my training and experience, I know that wireless providers such as PROVIDER typically collect and retain information about their subscribers in their normal course of business.  This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided

by the subscriber to pay for wireless communication service.  I also know that wireless providers

such as PROVIDER typically collect and retain information about their subscribers' use of the

wireless service, such as records about calls or other communications sent or received by a

particular device and other transactional records, in their normal course of business.  In my training

and experience, this information may constitute evidence of the crimes under investigation because

the information can be used to identify the TARGET PHONE NUMBER's user or users.

## AUTHORIZATION REQUEST

49.    Based on the foregoing, I request that the Court issue the proposed search warrant,

pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

50.    I further request that the Court direct PROVIDER to disclose to the government

any information described in Section I of Attachment B that is within its possession, custody, or

control.  The government shall reasonably compensate PROVIDER for reasonable expenses

incurred in furnishing such facilities or assistance.

51.    Because the warrant will be served on PROVIDER, who will then compile the

requested records at a time convenient to it, good cause exists under Rule 41 to permit the

execution of the requested warrant at any time in the day or night.  Further, pursuant to 18 U.S.C.

§ 2703(g), the presence of a law enforcement officer is not required for the service or execution of

this warrant.

## REQUEST TO SUBMIT WARRANT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

52.    I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of

Criminal Procedure, permission to communicate information to the Court by telephone in

connection with this Application for a Search Warrant.  I submit that Assistant U.S. Attorney

Jennifer Leigh Blackwell, an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

## **CONCLUSION**

78.     Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that evidence of the Subject Offenses may be located with the records and information associated with the TARGET PHONE NUMBER described in Attachment A. Therefore, I request that the Court issue the proposed search warrant to seize items described in Attachment B.

Respectfully submitted,

Garrett S. Churchill
Special Agent
Federal Bureau of Investigation

Subscribed and sworn telephonically pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on April 21, 2022.

HONORABLE G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.   I am employed by AT&T, and my title is _____.   I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of AT&T. The attached   records   consist   of   _____   **[GENERALLY   DESCRIBE RECORDS (pages/CDs/megabytes)]**.  I further state that:

a.     all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of AT&T, and they were made by AT&T as a regular practice; and

b.     such records were generated by AT&T's electronic process or system that produces an accurate result, to wit:

1.     the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of AT&T, in a manner to ensure that they are true duplicates of the original records; and

2.     the process or system is regularly verified by AT&T, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____     _____

Date                                              Signature